Jeanne NOLAN, Plaintiff,

v.

**HEALD COLLEGE, Heald College Long Term Disability Plan, Metropolitan Life Insurance Co., Defendants.**

**No. C 05–3399 VRW.**

United States District Court, N.D. California.

Aug. 27, 2010.

Cassie Springer–Sullivan & Michelle L. Roberts of Springer–Sullivan & Roberts LLP, Oakland, CA; and Geoffrey V. White of the Law Office of Geoffrey V. White, San Francisco, CA, for Plaintiff.

Rebecca Hull of Sedgwick, Detert, Moran & Arnold LLP, San Francisco, CA, for Defendants.

## ORDER

VAUGHN R. WALKER, Chief Judge.

On May 6, 2010, Magistrate Judge Larson issued a report and recommendation ("report") that the court grant plaintiff's motion for judgment on the administrative record and deny defendants' cross-motion for judgment. Doc. # 120. Defendants filed a motion objecting to the report and requesting de novo review. Doc. # 121. For the reasons set forth below, the court adopts in large part the recommendation

of the magistrate and ORDERS entry of judgment in favor of plaintiff Jeanne Nolan.

I

A

The relevant facts have been set forth on many different occasions, and the court does not repeat them at length here. *Nolan v. Heald College*, 2007 WL 878946, \*1–\*7 (N.D.Cal.2007) (Jenkins, J.) ("*Nolan I*") (Doc. ## 63, 74); *Nolan v. Heald College*, 551 F.3d 1148, 1150–53 (9th Cir. 2009) ("*Nolan II*"). Nolan brought an action alleging that MetLife violated the Employment Retirement Income Security Act of 1974 ("ERISA") as an administrator of a long-term disability ("LTD") benefits plan when it terminated Nolan's LTD benefits in 2004. Nolan began receiving LTD benefits in 2002 after falling at work at Heald College and suffering a broken wrist and a compression fracture in her spine. In denying Nolan's appeals, MetLife relied on the medical opinion of two doctors, who received and reviewed Nolan's medical records as referral consultants for Network Medical Review ("NMR"); neither examined Nolan in person. Dr. Silver, the first reviewer, found that Nolan's condition—a neuromusculoskeletal disorder—was subject to a 24 month benefit limitation and, furthermore, that there was no objective evidence that she was functionally disabled. MET 387–89.

In response to this denial, Nolan and the doctors treating her submitted additional information to demonstrate that she was functionally disabled and that the disability stemmed from radiculopathy, a neurodegenerative condition excluded from the benefit limitation. Dr. Jares, the second reviewer and a neurologist, confirmed that Nolan indeed suffered from radiculopathy but concluded that Nolan was not functionally disabled. MET 580–87, 608–09, 611–12.

The only additional information presented to Judge Larson that was unavailable to previous courts was the declaration of Laura Sullivan. Doc. # 101 Exh. A. The declaration comes from another case involving MetLife in the Northern District of California, *Dilley v. Metropolitan Life Ins. Co.*, 256 F.R.D. 643 (N.D.Cal.2009) (Hamilton, J.). The declaration pertains to MetLife's contractual relationship with Network Medical Review ("NMR"), the independent medical review company that referred Nolan's file to Dr. Silver and Dr. Jares. The declaration states that out of a total of 1,133,141 group disability claims MetLife received from 2005 through 2007, about 80 percent were paid for some period of time while around 20 percent were denied. Doc. # 101 Exh. A at ¶ 8. MetLife referred to NMR fewer than 1 percent of the claims in that period, approximately 9,056. *Id.* at ¶ 8. Of these 9,056 referred claims, in about 50 percent (4,598) payment stopped prior to referral and did not resume after referral; in about 18 percent (1,710) payments were never made; in about 13 percent (1,248) payments continued at first following referral but stopped at some point thereafter. *Id.* at ¶ 10. In about 15 percent of the claims, payments continued after the referral and had not ceased at the time of the query. *Id.* at ¶¶ 8–9.

Dr. Silver and Dr. Jares are not employees of NMR but are instead "independent physician consultants." *Id.* at ¶ 8. The declaration does not detail the percentage of referrals they receive from NMR or whether they consult exclusively for NMR.

B

As noted earlier, the court is not the first to consider this matter. Nolan originally filed an action against defendants on August 22, 2005, alleging violations of ERISA, 29 U.S.C. § 1001, et seq. Doc. # 1.

On September 12, 2006, defendants filed a motion for summary judgment, Doc. # 44, while Nolan filed a motion for judgment on the administrative record, Doc. # 48. Judge Jenkins granted defendants' motion for summary judgment and denied Nolan's motion, finding that MetLife had not abused its discretion in terminating Nolan's LTD benefits. Doc. # 63. Nolan filed a motion to alter judgment, Doc. # 65, which Judge Jenkins denied, Doc. # 74; *Nolan I*, 2007 WL 878946.

In response, Nolan appealed the order. Doc. # 75. The Ninth Circuit reversed and remanded, holding that because traditional rules of summary judgment applied in ERISA cases, the district court had erred in weighing and discounting evidence of MetLife's bias. *Nolan v. Heald College*, 551 F.3d 1148, 1154–56 (9th Cir.2009) ("*Nolan II*"). On remand, the case was referred to Magistrate Judge Larson for a report and recommendation on the parties' cross-motions for judgment. Doc. # 108. On May 20, 2010, Magistrate Judge Larson issued the report recommending that the court grant Nolan's motion. Doc. # 120. The report found MetLife had abused its discretion in terminating Nolan's benefits. *Id.* at 2.

## II

Defendants object to the report in its entirety pursuant to FRCP 72(b). Doc. # 121 at 8. The court reviews defendants' objections de novo. 28 U.S.C. § 636(b)(1)(C). Because defendants object to the standard of review adopted by the report toward the decisions of MetLife, Doc. # 121 at 19, the court determines the legal standard for reviewing decisions by a plan administrator under ERISA and then considers defendants' specific objections.

### A

■ The court reviews decisions by a plan administrator de novo unless the plan gives the administrator full "discretionary authority." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629 (9th Cir.2009) (quoting *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 866 (9th Cir.2008)). Where the plan grants discretion to the administrator, as it does here, the court reviews administrator decisions for abuse of discretion, *Conkright v. Frommert*, —— U.S. ——, 130 S.Ct. 1640, 1646, 176 L.Ed.2d 469 (2010). The court looks to "principles of trust law" when interpreting ERISA, *Conkright*, 130 S.Ct. at 1646 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)), as plan administrators are to act as impartial trustees in distributing benefits to plan members. Without a conflict, "the plan administrator's decision can be upheld if it is 'grounded on a ny reasonable basis,'" while with a conflict, the court must conduct "a more complex analysis." *Montour*, 588 F.3d at 629–30 (emphasis in original).

■ In the face of a conflict of interest, the standard of review remains abuse of discretion, but the analysis changes slightly. *Conkright*, 130 S.Ct. at 1646. The court must weigh evidence of a conflict as a "factor in determining whether there is an abuse of discretion." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2350, 171 L.Ed.2d 299 (2008) (citations omitted). When reviewing denials by administrators, the court is "to determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 128 S.Ct. at 2351.

■ A conflict of interest exists whenever a plan administrator also pays benefits claims, as is the case here. *Glenn*, 128 S.Ct. at 2348; see also *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir.2006) (en banc). In such instances, the court is to adjust its skepti-

cism of the administrator's decision based on a variety of factors. See *Nolan II*, 551 F.3d at 1153 (holding that "a court is required to consider the conflict whenever it exists, and to temper the abuse of discretion standard with skepticism 'commensurate' with the conflict") (internal citation omitted). Adjusting skepticism does not operate as a sliding scale standard—the standard remains abuse of discretion—but as a method by which a court may determine whether the conflict of interest improperly influenced the administrator's decision. See *Montour*, 588 F.3d at 631 (noting that *Abatie* " 'conscious[ly] reject[ed]' the 'sliding scale metaphor' "). Skepticism will be low if "a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Abatie*, 458 F.3d at 968. By contrast, skepticism will be high if

> the administrator provides inconsistent reasons for denial * * * fails adequately to investigate a claim or ask the plaintiff for necessary evidence * * * fails to credit a claimant's reliable evidence * * * or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968–69 (citations omitted).

Other relevant factors courts have found include whether the administrator acknowledged or distinguished a contrary disability determination by the Social Security Administration ("SSA"), *Glenn*, 128 S.Ct. at 2351; whether the administrator conducted an in-person medical evaluation or relied instead on a paper review, *Montour*, 588 F.3d at 630; and whether the administrator presented outside medical reviewers with all the relevant evidence, *Glenn*, 128 S.Ct. at 2352. An administrator can mitigate a conflict, "for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 128 S.Ct. at 2351.

## B

Here, defendants argue that the report fails to adopt the appropriate standard of review toward MetLife's decision to terminate Nolan's LTD benefits. Doc. # 121 at 20–21 (citing *Conkright*, 130 S.Ct. at 1644). Defendants contend that the report "compil[es] an unsupported laundry list that found bias in everything that MetLife did," and in doing so mandates the types of "special procedures and burdens" that are prohibited by *Glenn*. *Id.* at 20–21 (citing *Glenn*, 128 S.Ct. at 2351). Furthermore, defendants argue the report unfairly faults MetLife for not following procedures in 2004 that were not outlined until 5 years later in *Montour*. *Id.* at 21.

Contrary to defendants' assertion, the report adopts the correct standard of review—abuse of discretion—toward MetLife's decisions. The report states that courts will "not permit total deference to the plan administrator where evidence contradicting the propriety of the decision exists." Doc. # 120 at 2. In stating that something less than total deference will apply, the report is not dispensing with the abuse of discretion standard but is instead restating the requirement from *Abatie* that a structural conflict is a factor whenever reviewing an administrator's decision under an abuse of discretion standard. Indeed, the previous line from the report follows a quotation from *Abatie* outlining the requirement that courts consider structural conflicts. Doc. # 120 at 2 (quoting *Abatie*, 458 F.3d at 969). This approach is consistent with the Supreme Court's continued support for the abuse of discretion standard. *Conkright*, 130 S.Ct.

at 1644. The report recognizes that conflicts of interest inform application of the abuse of discretion standard.

■ The report errs to the extent it suggests that plan administrators facing a structural conflict must satisfy certain procedural requirements. Doc. # 120 at 2 ("[T]he administrator must justify its decision by explaining why it disregarded or acted contrary to a finding of disability by the Social Security Administration." (citing *Montour*, 588 F.3d 623 (9th Cir.2009))). As defendants correctly note, there is no single mandatory requirement for passing scrutiny under an abuse of discretion standard. *Glenn*, 128 S.Ct. at 2351. Rather, each aspect of MetLife's conduct—including its failure to address a contrary SSA determination and its failure to obtain an in-person medical examination—is merely a factor to be considered when determining whether a plan administrator abused its discretion. *Id.* at 2351–52.

■ Defendants argue, and the court agrees, that the statistics regarding the relationship between NMR and MetLife are not probative of bias. The Ninth Circuit held that statistics about a large financial relationship between the two parties "permitted an inference that Network Medical Review and Drs. Silver and Jares were biased in favor of MetLife." *Nolan II*, 551 F.3d at 1154. The inference, if true, would make summary judgment inappropriate. Its instructions on remand were:

If on remand the district court determines that the evidence of bias is not material—in other words, even viewing the evidence in the light most favorable to Nolan, the abuse of discretion standard is not tempered sufficiently to change the decision on the merits—then

summary judgment may remain appropriate.

*Nolan II*, 551 F.3d at 1155–56.

The court does not find these statistics standing alone to be probative of any bias on the part of NMR in its handling of claims from MetLife. Accord *Dilley*, 256 F.R.D. at 645 ("Details of the number of claims denied based on a medical records review by NMR would be meaningless unless a finding could be made that MetLife had wrongly denied those claims."); *Kludka v. Qwest Disability Plan*, 2010 WL 1408895, at *7 (D.Ariz.2010) (slip copy) (refusing to credit statistics on independent reviewer without evidence "that the doctors hired by [reviewer] receive additional money if they deny claims or that [reviewer] stops hiring doctors who frequently grant claims). In order to prove that NMR was biased, Nolan would have to produce statistics showing, for example, that non-NMR physicians, reviewing a pool of claims similar to that referred to NMR, made determinations favorable to beneficiaries at a rate higher than NMR physicians did. In the context of a larger inquiry, the statistics before the court do not sustain a finding of bias, because they do not on their own support an inference that a similar pool of claims reviewed by a different set of physicians would have had a lower denial rate. The court therefore does not include the statistics as a factor in its determination whether MetLife abused its discretion.

■ The court also does not find evidence in the record demonstrating that MetLife has a history of bias in claims decision-making. While the court may consider "a parsimonious claims-granting history" in determining whether a plan administrator abused its discretion, *Abatie*, 458 F.3d at 963, the only basis for such a conclusion here is past cases, such as *Saffon* and *Glenn*, where MetLife showed in-

stances of bias. Defendants are right in objecting that a "handful of judicial decisions criticizing specific case outcomes" does not establish a history of bias. Doc. # 121 at 30. It is possible that certain procedural deficiencies present here and in other cases, such as the failure to look at contrary SSA determinations, were a matter of company policy—and thus could show a history of bias—but there are no such allegations here.

■ Nevertheless, the evidence supports the finding that MetLife abused its discretion in terminating Nolan's LTD benefits. Many additional factors support a conclusion that skepticism of MetLife's determination is warranted.

The independent reviews conducted by the NMR physicians, Dr. Jares and Dr. Silver, are illuminating. MET 386–91, 580–89. Both relied on the Pringle Functional Capacity Examination ("FCE") to support their conclusions that Nolan was not functionally disabled at the time her LTD benefits stopped. The November Pringle FCE concluded that Nolan was capable of a working at "SEDENTARY physical demand level" based on her lifting capacities. MET 184. Pringle qualified this finding by noting: "Sitting is suggested to be tolerated cumulatively to 1 hour per day for no greater than 10 minute increments." MET 185. The report's plain meaning is that, while seated, Nolan was able to exert herself at a sedentary level, but that she was unable to remain seated for a long period of time. Drs. Silver and Jares ignored this crucial qualification. Dr. Silver wrote: "Ms Nolan left work even though an FCE on 11/21/02 showed that she was capable of doing sedentary work." MET 387. Dr. Jares wrote: "Please note that the functional capacities evaluation performed on November 21, 2002, indicated that she [Nolan] was able to perform a sedentary physical demand level." MET 596. Neither men-

tioned the limitation on sitting. As Jeff Malmuth, a subsequent vocational counselor hired by Nolan, noted: "An individual, as defined by the DOL [Department of Labor], should be capable of sitting up to 6 hours of a 8–hour day" in order to meet the requirements of sedentary work. MET 603.

While Drs. Silver and Jares are not expected to know the DOL standards, the fact that both reviewers seize upon her capacity to work without mentioning the scope of that capacity suggests that their review was either cursory at best or disingenuous at worst. In either case, this omission is an appropriate factor to consider when determining whether MetLife's conflict of interest affected its decision to terminate Nolan's benefits.

Moreover, the medical reviewers' reading of the FCE contradicts MetLife's own treatment of it. On April 11, 2003, a MetLife nurse noted in a claims log the inconsistency in the FCE report, but recommended that benefits continue. MET 627 (Nolan has "sed[entary] work capacity, but sitting tolerance is severely diminished."). MetLife changed its position on the FCE only when Nolan sought an extension of the 24 month limitation of benefits for neuromusculoskeletal disorders. That is, MetLife used an FCE conducted in November 2002, which it had previously ignored, to conclude that Nolan was no longer disabled in July 2004. This selective use of evidence supports a finding that MetLife allowed its conflict of interest to influence its termination of Nolan's benefits. See *Glenn,* 128 S.Ct. at 2352.

Without the support of the Pringle FCE, MetLife's decision to terminate Nolan's LTD benefits rests almost entirely on the grounds that she did not provide objective evidence of disability to substantiate her subjective complaints of pain. Defendants claim they should not have to credit Nolan's reports of subjective pain because she

applied for LTD benefits only after she was laid off from her position at Heald College, a fact she did not initially disclose to MetLife, and because she allegedly convinced her physician, Dr. Tse, to change his opinion about the severity of her injury and her capacity to work. Doc. #121 at 13.

These arguments are largely irrelevant to determining whether MetLife abused its discretion. While MetLife noticed initial discrepancies between Dr. Tse's reports and Nolan's claim, Doc. #121 at 131, MetLife later appeared to accept the version of events offered by Dr. Tse—that he had discouraged Nolan from returning to work and had only authorized her to work part time—because it subsequently began paying LTD benefits to Nolan. MET 621. Notwithstanding the fact that Nolan provided MetLife with the contradictory records when Nolan appealed the second time, Doc. #121 at 10, MetLife did not terminate Nolan's benefits because it uncovered evidence of deceit or because it had reason to doubt her truthfulness but instead because she did not provide objective evidence that she was disabled. MET 613–15. There is nothing in the administrative record to suggest Nolan's credibility was at the heart of MetLife's demand for objective evidence. MetLife appears to have treated Nolan no differently from any other beneficiary whose claims relied heavily on subjective reports.

Nolan's credibility is relevant at this stage only to the extent the court's determination of whether MetLife abused its discretion factors in "the quantity and quality of medical evidence." *Montour*, 588 F.3d at 630. In reviewing the medical evidence, the court notes that the record does not consist solely of Nolan's subjective reports of pain but includes x-rays, MRIs and doctor observations to substantiate those reports. MET 581–85. Even if Nolan's credibility were to play a larger

role, initially inconsistent stories need not discredit the next three years of medical evidence that Nolan provided to MetLife. Thus the court finds that Nolan's credibility is a negligible factor in determining whether MetLife abused its discretion.

If MetLife's position was that Nolan should have objectively proven her pain, which by its nature is "not easily determined by reference to objective measurements," then defendants are on shaky ground. *Saffon*, 522 F.3d at 872–73 ("If MetLife is turning down [plaintiff's] application for benefits based on [plaintiff's] failure to produce evidence that simply is not available, that too may bear on the degree of deference the district court shall accord MetLife's decision."). Thus, the report's inclusion of MetLife's position on subjective pain as a factor in its determination was correct.

While Nolan had the burden of producing evidence of disability, MetLife had a duty to explain what would satisfy that burden. The report correctly relies on *Saffon* for the proposition that "a plan administrator is required to explain why it believes a claimant's submitted medical evidence is inadequate." Doc. #120 (citing *Saffon*, 522 F.3d at 870) (emphasis in original). In *Saffon*, the court faulted MetLife for not "engag[ing] [plaintiff's doctor's] contrary assertion." 522 F.3d at 870. Here, MetLife did not explain fully to Nolan why the evidence she attempted to provide—for example, the May 5, 2005 MRI, MET 563, or the May 13, 2004 physical capacity evaluation by Dr. Minkowsky, MET 155–56—failed to support a finding of disability. MET 614. MetLife's failure to explain extends to the medical reviewers: Dr. Jares, for example, merely recites Dr. Minkowsky's physical capacity evaluation without explaining why he deems it to be insufficient. MET 583. MetLife could have told Nolan the specific types of tests and objective evidence that would have

supported a finding of disability. Thus, the report was correct to include as a factor MetLife's failure to explain to Nolan the evidence she needed to provide to prevail on her claim.

Defendants object that requirements such as disclosure shift the burden of proof to MetLife "for not meeting alleged legal standards" courts found relevant in *Saffon*, *Montour* and *Glenn*, many years after the termination of benefits in 2004. Doc. # 121 at 8, 25 n. 33. No such burden exists. Defendants do not have to prove that they were unaffected by a conflict of interest. A plaintiff may point to relevant factors for courts to weigh when deciding whether a conflict of interest led a plan administrator to abuse its discretion. See *Abatie*, 458 F.3d at 968. In response, plan administrators may demonstrate that they have taken steps to minimize the conflict. *Glenn*, 128 S.Ct. at 2351. Such steps are not legally obligatory merely because they make it easier for an administrator to defend itself against charges of bias.

Defendants cite no legal authorities in support of their argument that plan administrators are only subject to legal standards that are contemporaneous with plan decisions. The report's conclusion that MetLife did, in fact, abuse its discretion is warranted given that courts now have the benefit of *Saffon*, *Montour* and *Glenn*, which more clearly articulate the "specific factors that a court should weigh in determining whether an administrator abused its discretion." *Sterio v. HM Life*, 369 Fed.Appx. 801, 804–05 (9th Cir.2010) (unpublished) (citation omitted) (reversing pre-*Montour* district court decision even though it "did not have the benefit of the additional guidance provided in *Montour* ").

In sum, the report correctly finds that MetLife abused its discretion. The court

finds MetLife's failure to conduct an in-person medical examination, failure to distinguish a contrary SSA determination, failure to explain the evidence necessary to make a successful appeal and selective use of evidence are all factors that support "giving more weight to the conflict [of interest]," *Glenn*, 128 S.Ct. at 2352, and the conclusion that MetLife abused its discretion.

### III

Having determined that MetLife abused its discretion, the court ADOPTS the report's recommendation that Nolan's motion for judgment on partial findings, Doc. # 97, be granted. Nolan's claim is REMANDED to the administrator for reinstatement of benefits retroactive to July 9, 2004, plus pre-judgment interest, attorney fees and costs. The clerk is directed to terminate all motions, enter judgment in favor of plaintiff and close the file.

IT IS SO ORDERED.

**REPORT AND RECOMMENDATION re Plaintiff's motion for Judgment on Partial Findings (Docket # 97)**

JAMES LARSON, United States Magistrate Judge.

Plaintiff's motion for judgment on partial findings was referred by the district court (Hon. Vaughn R. Walker) under 28 U.S.C. § 636(b). The matter came on for hearing. Attorney for Plaintiff was Cassie Springer–Sullivan, SPRINGER–SULLIVAN & ROBERTS LLP. Attorney for Defendants was Rebecca A. Hull, SEDGWICK, DETERT, MORAN & ARNOLD LLP. After the hearing, the Court permitted further briefing incorporating the decision in *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir.2009), which had been decided after this motion was fully briefed.[1] The matter was then submitted.

---

1. This Court is also aware of the U.S. Supreme Court decision in *Conkright* and finds

This Court carefully considered the moving and opposing papers, and the arguments of counsel, and hereby recommends that Plaintiff's motion be granted and Defendants' cross-motion be denied. MetLife had a structural conflict of interest which requires that the court adopt a skeptical rather than deferential standard of review of the plan administrator's decision to terminate Jeanne Nolan's disability benefits after two years. MetLife, as both the fiduciary and the administrator, made the decision whether to pay its own money to Nolan in the form of disability benefits. It therefore had a conflict of interest which led to its decision to deny Plaintiff Jeanne Nolan continued disability benefits after two years.

A standard of review that is untempered by skepticism is far more lenient to the plan administrator, and, arguably, permits upholding decisions that are contrary to the evidence in the record as sanctioned by *Bendixen.* However, following *Abatie* and *Glenn,* this is no longer a permissible standard of review because "[g]oing forward, plaintiffs will have the benefit of an abuse of discretion review that always considers the inherent conflict when a plan administrator is also the fiduciary, even in the absence of 'smoking gun' evidence of conflict." *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 969 (9th Cir.2006). This more stringent standard of review does not permit total deference to the plan administrator where evidence contradicting the propriety of the decision exists. In addition, the administrator must justify its decision by explaining why it disregarded or acted contrary to a finding of disability by the Social Security Administration and the court should also consider whether the administrator has adequately considered the medical record when it does not conduct its own medical examination. *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623 (9th Cir.2009).

As set forth in Plaintiff's Motion, Nolan submitted ample evidence proving that she is disabled by pain resulting from radiculopathy, a condition that is not subject to the Plan's 24–month benefit limitation provision. MetLife impermissibly ignored Nolan's medical evidence in favor of its own records reviewers.

## I. INTRODUCTION

Plaintiff Jeanne Nolan was Executive Director of Heald College from December 2001. In April 2002 she tripped on a floor mat at work and landed flat on her back. She was unable to get up and was taken by ambulance to a hospital emergency room. She was diagnosed with low back and left wrist fractures causing severe pain. She tried after a couple of months to return to work with light duties and accommodations, but was unable to perform her normal job duties. She received Workers Compensation and then in August applied for and received long term disability (LTD) benefits from Defendant MetLife through her employer which she received for two years. This benefit was retroactively approved in March 2004 effective July 2002. MetLife then terminated her benefit in June 2004 on the basis that her disability resulted from a "neuromusculoskeletal disorder" subject to a two-year limitation for payment of benefits. Nolan appealed in December 2004, on the grounds that her disability resulted from cervical radiculopathy, an exception to the

it inapplicable to the facts of this case. "The question here is whether a single honest mistake in plan interpretation justifies stripping the administrator of that deference for subsequent related interpretations of the plan. We hold that it does not." *Conkright v. Frommert,* —— U.S. ——, 130 S.Ct. 1640, 1644, 176 L.Ed.2d 469 (2010). This case involves not "a single honest mistake," but a number of deliberate actions by the plan administrator.

24–month limitation. This began a long process of appeals and ultimately this lawsuit, which has been up to the Ninth Circuit and returns to this Court on remand, following reversal of a decision by Judge Martin Jenkins, to whom the case was previously assigned. Chief Judge Vaughn R. Walker referred the matter to this Court for Report and Recommendation on Plaintiff's motion for judgment on partial findings, effectively a bench trial, on the question whether MetLife's conflict of interest led it to make unreasonable findings in its own behalf and against Plaintiff.

There are two questions to be answered in this case: how much or how little deference should the Court afford to MetLife's decision-making, and did MetLife abuse its discretion in determining that Nolan was no longer disabled after paying her benefits for two years?

Nolan was severely injured, and MetLife initially acknowledged liability. After 24 months MetLife terminated benefit payments, rejecting Nolan's doctors' diagnoses of radiculopathy. MetLife sought to discredit the radiculopathy diagnosis by sending Nolan's file to its records reviewer, Network Medical Review ("NMR"). But NMR could not deny Nolan's radiculopathy diagnosis. Instead, NMR opined that despite all of the treating physicians' recommendations, Nolan should be able to work. MetLife, which had previously found Nolan disabled, then decided that although Nolan had radiculopathy, she was not disabled according to the NMR reviewers, and based on a Functional Capacity Examination that it had previously determined supported her disability.

A skeptical review of MetLife's handling of Nolan's claim shows that she is disabled by pain resulting from radiculopathy, which is not a condition limited to 24–months of benefits, and that MetLife abused its discretion in refusing to reinstate her benefits.

## II. STATEMENT OF FACTS

MetLife spends much of its brief emphasizing facts that are irrelevant to the question of whether it abused its discretion in terminating Nolan's disability benefits. First, MetLife admits that "Defendants did not seek to return [sic] of the benefits she received" (Opp. Br. at 7:6–7) for the first two years of Nolan's disability. Even if her application for benefits in 2002 was relevant to the denial of benefits in 2004, Nolan argues that she and Dr. Tse were entirely truthful in Nolan's application for benefits.

After Plaintiff suffered her spinal fracture, "obliteration" of disc space, and wrist fracture on April 10, 2002, in an April 17, 2002 record, Dr. Tse noted that Nolan's fracture remained unchanged, that she had difficulty getting in and out of cars and bed, that "she cannot sit down," and that she would be off work for "at least 3–4 weeks." MET 0262. However, as Nolan states, "I am a conscientious employee and I wanted to return to limited to work to see if I could manage it .... I was adamant about wanting to return to work and Dr. Tse reluctantly agreed" to modified, part-time duty. MET 0315.

Dr. Tse's records corroborate this statement. On May 1, 2002, just 13 days after he had stated that Nolan would be out of work for "at least 3–4 weeks," he wrote a brief note entitled "Disability Certificate" stating that Nolan could return to "light" work duties, which was to be reassessed after two weeks. MET 0344. On that same day, Dr. Tse wrote in a separate letter that "[t]here is still pain as anticipated, at least she can start doing some paperwork in her home office. Household assistance would be appreciated for the next three weeks." MET 0260. He also noted that her cast would not be removed for another two weeks and that she re-

quired a zero gravity chair, among other things, in order to do part-time work. *Id.* Thus, the May 1, 2002 notes from Dr. Tse document the credibility of Nolan's statement to MetLife that Dr. Tse merely released her to a work trial with substantial accommodations; he never released her to return to her regular, full-time, unaccommodated occupational duties.

Subsequently, Nolan attempted to perform part-time duties, but "the result of this experiment was that I learned that I was unable to perform even light duty." MET 0315. Dr. Tse's June 14, 2002 note wholly corroborates Nolan's statement: he writes that even if Nolan's job was still available, "she remains disabled from the full range of the usual and customary occupation." MET 0257. Moreover, Nolan and Dr. Tse both informed MetLife from the beginning of Nolan's attempt to return to limited work duties, as Defendants admit. Opp. Brief at p. 11:14–15. Indeed, although MetLife asserts that Nolan misleadingly stated on her disability claim form that her last day of work was April 10, 2002 (*id.* at 15:6), Nolan clearly stated on the form that her last day of "full time" work was April 10, 2002, which is entirely truthful. MET 0123. MetLife approved Nolan's benefits after evaluating all of this information. The seriousness of Nolan's injury, coupled with her extensive work history as well as her and her doctors' consistent and truthful statements demonstrates that MetLife's argument lacks merit and underscores Nolan's credibility.

Second, MetLife states that Dr. Silver's 2005 Physical Capabilities Form (MET 0390) is "strikingly similar" to Dr. Tse's restrictions imposed when he released Nolan to a part-time work trial in May 2002. Opp. Br. at 16:8–9, citing Dr. Tse's records at MET 0258, 260, 344.

This assertion is false. In his form, Dr. Silver states that Nolan is totally unrestricted in her ability to sit, stand, walk, and lift 20 pounds during an 8–hour workday. MET 0390. Dr. Tse, however, wrote in May 2002 that Nolan needed "household assistance," could do "no lifting" over 15 pounds nor repetitive bending, and that "[h]er sitting tolerance is poor." MET 0344, 260, 258. Moreover, in his July 5, 2002 Physical Capabilities form, which was the first time that Dr. Tse was asked to complete a form similar to the one MetLife had Dr. Silver complete, Dr. Tse stated that Nolan could, in an 8 hour work-day, sit for 3 hours intermittently, stand for 3 hours intermittently, walk for 4 hours intermittently, could not twist, bend, or stoop, and could only occasionally lift up to 20 pounds. He further stated that Nolan must "avoid lifting, repetitive bending; prolonged sitting." MET 0109. Thus, Dr. Silver's conclusions, which were not based on his examination of Nolan, bear little resemblance to Dr. Tse's restrictions, and are certainly not "strikingly similar."

Finally, MetLife contends that Nolan "applied for wrongful termination, alleging that she was ready, willing and able to go to work, but was wrongfully discharged." Opp. Brief at 6:n. 6; 13:n. 12. However, Judge Jenkins determined that he "agrees that the state court complaint could be read as an allegation that Plaintiff was prepared to perform her job duties, provided that Heald continued to accommodate her alleged disability .... The Court therefore concludes that Plaintiff's state court allegations, do not qualify as judicial admissions for purposes of this motion." Docket No. 63 at 14:4–15. Defendants did not cross-appeal the judgment. Therefore, this conclusion remains the law of the case, and this "fact" is irrelevant to Plaintiff's motion.

## III. ANALYSIS

### A. MetLife's conflict of interest is significant and warrants skepticism of its decision to terminate Nolan's benefits.

██ Defendants misstate the Supreme Court's holding in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008) as concluding that an insurer is entitled to "great deference" where there are no other factors suggesting that a claim was mishandled. Opp. Br. at 20:2–4. Instead, the Court held that the mere fact that a financial conflict of interest exists, as here, must be weighed in evaluating whether the administrator has abused its discretion in denying benefits. The key passage pertaining to how a court should evaluate the conflict of interest reads as follows:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance. The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. See *Langbein*, supra, at 1317–1321 (detailing such a history for one large insurer). It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits.

*Glenn*, 128 S.Ct. at 2351. MetLife has proffered no evidence of taking "active steps to reduce potential bias." Instead, it offers the Declaration of Laura Sullivan, which actually supports an inference of biased decision-making. Plaintiff objects to this Declaration, but argues it favors her position.

### 1. The Sullivan Declaration, if considered, shows that MetLife relies on NMR to justify denying claims.

For the first time in this litigation, and without disclosing her as a witness, Defendants advance the Declaration of Laura Sullivan, filed in an unrelated case and therefore not subject to cross-examination by Nolan, to attempt to prove the neutrality of NMR in rendering decisions for MetLife. Plaintiff objected to this declaration because discovery closed long ago in this case; Defendants never disclosed Ms. Sullivan as a witness in this case; and, in the parties' Joint Case Management Statement filed on July 8, 2009 (Docket No. 95), Defendants stated that "[t]he parties do not anticipate taking any additional discovery."

The Sullivan Declaration actually supports a finding that NMR makes medical recommendations that are in MetLife's financial interest. Although Defendants break down the number of claims NMR reviewed into many groups (Opp. Br. at 4:2–12), its analysis cannot disguise the overall figure: according to the Sullivan Declaration, MetLife either never pays or stops paying benefits on 81–91% of the claims that NMR reviews for it. MetLife obfuscates the facts with vague explanations of its different categories, but when the categories are examined closely, as follows, they reveal a pattern of sending claims to NMR in order to justify the cessation of benefits.

- MetLife states that of the 9,056 claims sent to NMR in a two-year period, 18% were never paid. In practical terms, this means that MetLife denied the initial claim, sent the file to NMR for a records review, received a "favorable" review from NMR, and therefore never paid benefits at all.

- MetLife states that half were paid for some period, but benefits stopped prior to the referral. For these 4,528 claims, such as Nolan's, MetLife initially approved benefits, then decided to terminate benefits at a later date. When the participant appealed, Met-Life sent the file to NMR for a records review, and the decision came back "favorable" to MetLife, so that benefits never commenced again.

- MetLife states that 13% were paid for some period, then benefits stopped after the referral. This means that MetLife initially approved benefits, then sent the file to NMR for a records review. Again, the review came back favorable to MetLife's financial interest, and benefits were discontinued as a result of the NMR review.

- MetLife states that it is "unclear" what happened to 10% of these referrals, but, based on its and NMR's track record, one can make an educated guess that most, if not all, of these reviews were in MetLife's favor as well.

In sum, the Sullivan declaration only supports Nolan's contention that NMR is in the business of rendering determinations favorable to MetLife, in that of the 9,056 claims that MetLife claims to have sent to NMR, it used their conclusions to justify closing approximately 7,335 to 8,240 claims, thereby saving itself millions of dollars.

## 2. The Ninth Circuit has already ruled that Plaintiff shows evidence of MetLife's bias sufficient to require an abuse of discretion standard of review.

Additionally, the Ninth Circuit has already determined in this case that "the evidence of bias that Nolan submitted, and which was outside of the administrative record, bore directly on the contours of the abuse of discretion standard, as it permitted an inference that Network Medical Review and Drs. Silver and Jares were biased in favor of MetLife." *Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir.2009). The Court further determined that NMR and MetLife's financial relationship "indicated that Network Medical Review, Dr. Silver, and Dr. Jares received substantial work and monies from MetLife in the three-to-four years preceding and including Nolan's benefits denial." *Id.* at 1152. The court noted that MetLife's "strongest grounds for denying benefits," that is, the NMR reviews, were "undermined" by the evidence of bias when taken as true. *Id.* at 1155, n. 5. Thus, the Ninth Circuit has already underscored the significance of NMR and MetLife's financial interdependence, and commented on its importance in evaluating MetLife's decision to terminate Nolan's benefits. This is the law of the case, and the new Sullivan Declaration does not cancel the Ninth Circuit's finding of bias, particularly since it supports Plaintiff's contentions, not Defendants'.

## 3. The importance of the Social Security award and lack of an IME.

### a. Defendants confuse *Glenn* with *Nord*

Defendants argue that "MetLife is entitled to credit the opinions of the IPCs [independent physician consultants] who

analyze the claims, even when those opinions contradict those of the treating physician." Opp. Br. at 27:23–25, citing *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). However, the *Nord* decision, having to do with whether courts should defer to the opinion of the treating physician as in Social Security cases, has nothing to do with the Supreme Court's recent analysis of the importance of Social Security decisions in *Glenn,* 128 S.Ct. at 2352. In that case, MetLife "encouraged Glenn to argue to the Social Security Administration that she could do no work, received the bulk of the benefits of her success in doing so [being entitled to receive an offset from her retroactive Social Security award], and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work." *Id.* Based on this demonstration of MetLife's self-interested actions, the Court concluded that it was appropriate to afford MetLife less deference:

> "This course of events was not only an important factor in its own right (because it suggested procedural unreasonableness), but also would have justified the court in giving more weight to the conflict (because MetLife's seemingly inconsistent positions were both financially advantageous)."

*Id.*

■ *Glenn* is binding authority for the proposition that where, as here, MetLife benefited financially from a Social Security award, which has a more stringent standard for a finding of disability than the Plan's, then ceasing to pay benefits out of its own pocket, it is evidence of both procedural unreasonableness and MetLife's conflict of interest, which reduces the deference owed and increases the skepticism to be applied to its adverse decision.

**b. *Montour* requires an explanation re SSA determination and lack of IME**

**i. Explanation of consideration re SSA award**

■ Where a plan administrator has a structural conflict of interest, and denies a claim, the court must consider a number of factors, including the reason the administrator gives for rejecting the Social Security decision. *Montour v. Hartford Life & Acc. Ins. Co.,* 588 F.3d 623 (9th Cir.2009).

> "Hartford's failure to explain why it reached a different conclusion than the SSA is yet another factor to consider in reviewing the administrator's decision for abuse of discretion, particularly where, as here, a plan administrator operating with a conflict of interest requires a claimant to apply and then benefits financially from the SSA's disability finding. See *MetLife II,* 128 S.Ct. at 2352 ("This course of events [is] not only an important factor in its own right (because it suggest[s] procedural unreasonableness), but also would ... justif[y] the court in giving more weight to the conflict (because [Hartford]'s seemingly inconsistent positions were both financially advantageous).")."

*Id.* at 637.

In this case, as in *Montour,* the reviews of Dr. Jares and Dr. Silver do not even mention the Social Security decision as a record available for review, let alone explain the basis for disagreeing with it. See MET386, MET580. Defendants attempt to distinguish the cases by stating that in *Montour* the determination by the court of the relevance of an insurance company's failure to address a contrary SSA determination hinges on the timing of the SSA decision in relation to the timing of the insurance company's decision to terminate benefits. Def.'s Supp. Brief at 4:2–6. To the contrary, the facts of *Montour* show

that, as here, the SSA reached a favorable determination years before the insurer terminated Montour's benefits. 588 F.3d at 635. Nevertheless, the court found that the insurer's failure to "articulate why the SSA might have reached a different conclusion" indicated a lack of a principled and deliberative reasoning process. 588 F.3d at 638.

### ii. Failure to conduct IME, not just "pure paper review"

■ In addition, failure by the administrator to perform an independent medical examination ("IME"), not just a record review, or "pure paper" review, may also be an indicator of bias, where the claim is denied. Defendants argue that "the record supports that MetLife provided the independent physician consultants with all of the evidence in the record. Therefore, the basis set forth in *Montour* for weighing the lack of an IME as a factor does not exist here." Def.'s Supp. Brief at 6:7–9.

To the contrary, there is extensive evidence that MetLife's reviewing physicians did not consider all of the evidence in the record. For example, in his report Dr. Silver cites only 52 pages of records reviewed for Dr. Tse [MET 0386], when Nolan's Appeal contained 130 pages of Dr. Tse's chart notes. Docket No. 48, Exh. 2 at JN 43–172. Similarly, Dr. Silver cites only 86 pages received of Dr. Minkowski's chart, when her Appeal contained 110 pages. Compare *id.* at JN 173–282 with MET 0386. Indeed, in her Motion for Judgment, Plaintiff set forth an extensive chart documenting all of the medical findings that Dr. Silver and Dr. Jares ignored. Mot. for Judgment at p. 24. Therefore, contrary to Defendants' statement, the record actually proves that MetLife did not provide the physician consultants with all of the evidence in the record.

Moreover, the court in *Montour* specifically stated that because the reviewing doctors did not mention the Social Security Administration's ("SSA") "contrary conclusion, 'not even to discount or disagree with it, which indicates that [they] may not even have been aware of it,'" the thoroughness of these "pure paper" reviews was questionable. 588 F.3d at 634

### 4. MetLife's past behavior is relevant.

■ Defendants state that the only relevant evidence of bias in this case is how MetLife handled Nolan's claim. Opp. Br. 25:8–12. The *Glenn* case specifically states that the administrator's actions in other cases are crucial to the court's evaluation of what degree of deference to afford: "The conflict of interest at issue here, for example, should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." 128 S.Ct. at 2351.

Thus, the analysis of MetLife's biased decision-making as set forth in other opinions is, by Supreme Court edict, of great importance in evaluating the degree of deference afforded in this case. MetLife dismisses Plaintiff's citation to cases in which courts have disapproved of MetLife's claims handling practices as irrelevant (Opp. Br. at 26:13–24), yet MetLife cites no cases to demonstrate that courts have approved MetLife's neutral claims administration procedures or that MetLife has met the requirements of neutralizing the conflict in *Glenn.*, 128 S.Ct. at 2351.

Defendants cite *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 83 (2nd Cir. 2009) for the proposition that the conflict must actually influence the claims decision or else it is irrelevant. However, the court's conclusion in *Hobson* that "we decline to afford MetLife's conflict of interest

any weight in our review," directly conflicts with the *Glenn* instruction that a financial conflict of interest "must be weighed as a factor in determining whether there is an abuse of discretion," and that finding and administering an insurance policy is a structural conflict of interest in itself. *Glenn*, 128 S.Ct. 2343, 2348 (internal citations omitted); see also *Abatie*, 458 F.3d at 966 ("an inherent conflict of interest, even if merely formal and unaccompanied by indicia of bad faith or self-dealing, ought to have some effect on judicial review.")

### 5. Defendants misstate the *Abatie* decision.

Defendants state that in determining how much deference to afford the plan administrator, "When an administrator can show that it has engaged in an 'ongoing, good faith exchange of information between the administrator and the claimant,' the court should give the administrator's decision broad deference . . . ." Opp. Br. at 20:19–25, quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972 (9th Cir. 2006) (en banc). Defendants omit other material portions of this quotation. In this passage, the court was discussing procedural irregularities, not conflicts of interest. The full passage reads:

> A procedural irregularity, like a conflict of interest, is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion. *Fought*, 379 F.3d at 1006 (concluding that an inherent conflict of interest, a proven conflict of interest, or a serious procedural irregularity reduces the deference owed to an administrator's decision to deny benefits); *Woo*, 144 F.3d at 1160 (noting that a conflict of interest or a procedural irregularity can heighten judicial scrutiny). When an administrator can show that it has engaged in an " 'ongoing, good faith exchange of information between the administrator and

the claimant,' " the court should give the administrator's decision broad deference notwithstanding a minor irregularity. *Id.*

Thus, the court concluded that minor procedural irregularities may not make a difference in the amount of deference afforded to an administrator, not that conflicts of interest in general are neutralized by an exchange of information. Indeed, the court in *Abatie* specifically held that "an inherent conflict of interest, even if merely formal and unaccompanied by indicia of bad faith or self-dealing, ought to have some effect on judicial review." *Id.* at 966. This decision foreshadowed the Supreme Court's holding in *Glenn*.

### B. Under a skeptical review standard, MetLife abused its discretion in terminating Nolan's benefits.

Once Nolan proved to MetLife that she suffered from radiculopathy, MetLife should have immediately reinstated her benefits instead of fishing for a new excuse to stop paying her. To justify MetLife's actions, Defendants cite inapplicable cases and ignore Ninth Circuit precedent.

### 1. Defendants cite inapplicable cases to justify ignoring medical evidence.

Defendants cite *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 944 (9th Cir.1999) and *Taft v. Equitable Life Assur. Society*, 9 F.3d 1469, 1473 (9th Cir.1993) for the proposition that "even decisions contrary to evidence in the record do not necessarily amount to an abuse of discretion." Opp. Br. at 19:24–27. Defendants overlook the fact that *Bendixen* and *Taft* pre-date *Abatie* and *Glenn*, and therefore have no value in analyzing whether MetLife abused its discretion in terminating Nolan's benefits, because those cases applied an untempered abuse of discretion review. Indeed,

the Ninth Circuit acknowledged as much when this case was on appeal: "Importantly though, *Bendixen* predated *Abatie* and its requirement that any conflict always be considered, applied an abuse of discretion standard untempered in any way, and did not involve a case where the district court examined evidence outside of the administrative record." *Nolan,* 551 F.3d at 1154.

A standard of review that is untempered by skepticism is far more lenient to the plan administrator, and arguably permits upholding decisions that are contrary to the evidence in the record as sanctioned by *Bendixen.* However, following *Abatie* and *Glenn,* this is no longer a permissible standard of review because "[g]oing forward, plaintiffs will have the benefit of an abuse of discretion review that always considers the inherent conflict when a plan administrator is also the fiduciary, even in the absence of 'smoking gun' evidence of conflict." *Abatie,* 458 F.3d at 969. This more stringent standard of review does not permit total deference to the plan administrator where evidence contradicting the propriety of the decision exists.

Nolan submitted ample evidence that she is disabled by pain resulting from radiculopathy, a condition that is not subject to the Plan's 24-month benefit limitation. Contrary to its protests in litigation (Opp. Br. at 23:20–28), MetLife impermissibly ignored Nolan's medical evidence in favor of its own record reviewers.

■ In *Saffon v. Wells Fargo & Co. Long Term Disability Plan,* 522 F.3d 863, 870 (9th Cir.2008), the Ninth Circuit explained that a plan administrator is required to explain *why* it believes a claimant's submitted medical evidence is inadequate, beyond the mere conclusion that it is. MetLife's termination letter to Saffon is equally uninformative. It notes merely that "[t]he medical information provided no longer provides evidence of disability that would prevent you from performing

your job or occupation," but does not explain why that is the case, and certainly does not engage Dr. Kudrow's contrary assertion. The termination letter does suggest Saffon can appeal by providing "objective medical information to support [her] inability to perform the duties of [her] occupation," but does not explain why the information Saffon has already provided is insufficient for that purpose. Here, MetLife argues that by asserting in its denial letter that the medical evidence did not establish a sufficiently disabling loss of function, it has considered Nolan's medical evidence. Opp. Br. at 23:20–28. As the Ninth Circuit stated in *Saffon,* "MetLife cannot be faulted for taking our instructions in *Booton [v. Lockheed Medical Ben. Plan,* 110 F.3d 1461 (9th Cir. 1997)] [to engage in a meaningful dialogue] too seriously," because merely stating that the information does not support disability does not address the question of "why not?". 522 F.3d at 870.

"Considering" Nolan's evidence does not mean that MetLife must automatically accept it as proving entitlement to benefits, as Defendants argue. Opp. Br. 20:26–27. According to the edict in *Saffon,* considering Nolan's evidence means that MetLife needed to "explain why the information [Nolan] has already provided is insufficient ...." 522 F.3d at 870. Here, MetLife's statement in its denial letter that "the medical information does not support a severity of impairment that would prevent Dr. Nolan from performing her own job" (MET 0614) completely fails to explain why this information was insufficient, and its decision, which ignores Nolan's physicians' findings and conclusions, constitutes an abuse of discretion.

**2. Defendants cannot ignore precedent requiring MetLife to consider complaints of pain.**

Defendants' citation to out-of-circuit authority to contradict Ninth Circuit prece-

dent which requires consideration of complaints of pain is unavailing. Opp. Br. at 22, citing *Maniatty v. UNUM Provident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y. 2002), *Boardman v. Prudential Ins. Co.*, 337 F.3d 9, 16 n. 5 (1st Cir.2003), *Pralutsky v. Metro. Life Ins. Co.*, 435 F.3d 833 (8th Cir.2006).

 In *Saffon*, the Ninth Circuit emphasized that pain cannot be gauged by objective evidence, because pain is inherently subjective. 522 F.3d at 872–73 ("individual reactions to pain are subjective and not easily determined by reference to objective measurements.") The court in that case held that MetLife's insistence on objective evidence of pain "may bear on the degree of deference the district court shall accord MetLife's decision and on its ultimate determination as to whether Saffon is disabled." *Id.* Here, Nolan provided sufficiently objective proof of radiculopathy that MetLife itself accepted the diagnosis as true. MET 0613–14. However, because Nolan's pain resulting from the radiculopathy cannot be quantified by objective measurements, it was an abuse of discretion for MetLife to so require, and its decision cannot stand as a result.

Equally unavailing is MetLife's citation to *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir.2004) for the proposition that MetLife was entitled to terminate benefits despite no change in Nolan's condition. As the Ninth Circuit stated in *Saffon*, "After all, MetLife had been paying Saffon long-term disability benefits for a year, which suggests that she was already disabled. In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration." 522 F.3d at 871. Likewise, here, MetLife pointed to no evidence suggesting that Nolan's condition had improved since it began paying benefits two years before. Under *Saffon*, this "suggests that she was already disabled,"

and makes a reversal of MetLife's determination appropriate.

## IV. CONCLUSION

For all of the foregoing reasons, this Court recommends that Plaintiff's motion for judgment on partial findings be granted, and that the district court remand her claim to the administrator for reinstatement of benefits, retroactive to July 9, 2004 (MET 0171), plus pre-judgment interest, attorneys' fees, and costs.

May 6, 2010.