Kanika **BLEDSOE,** Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE; Colgate–Palmolive Welfare Benefit Plan, Defendants.**

**Case No. ED CV 13–02270–AB (SPx).**

United States District Court, C.D. California.

Signed Feb. 3, 2015.

Glenn R. Kantor, Peter S. Sessions, Kantor and Kantor LLP, Northridge, CA, for Plaintiff.

Misty A. Murray, Theresa J. Macellaro, Gail Ellen Cohen, Hinshaw & Culbertson LLP, Los Angeles, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT

ANDRÉ BIROTTE JR., District Judge.

Pending before the Court is the Employment Retirement Income Security Act ("ERISA") action concerning the termination of Plaintiff Kanika Bledsoe's ("Plaintiff") long-term disability ("LTD") benefits, pursuant to 29 U.S.C. § 1132(a)(1)(B). (*See* Complaint, Dkt. No. 1.) Plaintiff seeks reinstatement of the LTD benefits under an ERISA-governed benefit plan ("Plan"). Defendants Metropolitan Life Insurance Company ("MetLife") and Colgate–Palmolive Company (collectively "Defendants") operate as the administrators of claims made under the Plan. On October 27, 2014, Plaintiff filed a Motion for Summary Judgment, which has now been converted to a trial brief. (Pl. Br., Dkt. No. 38.) On November 3, 2014, Defendants filed an opposition to the Motion for Summary Judgment, which has now been converted to a trial brief. (Def. Br., Dkt. No. 44.) On November 10, 2014, Plaintiff filed a Reply, which has now been converted as a responsive trial brief. (Pl. Reply, Dkt. No. 47.) An Administrative Record ("AR") was submitted on October 29, 2014. (Dkt. No. 44.) A bench trial commenced on January 5, 2015. (Dkt. No. 54.) Upon reviewing the Parties' trial briefs and the Administrative Record, the Court finds for Plaintiff and the LTD Benefits are hereby reinstated.

## I. FINDINGS OF FACT

"In bench trials, Fed.R.Civ.P. 52(a) requires a court to 'find the facts specially and state separately its conclusions of law thereon.'" *Vance v. American Hawaii Cruises, Inc.,* 789 F.2d 790, 792 (9th Cir.

1986) (quoting Fed.R.Civ.P. 52(a)). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the basis of the trial court's decision. This purpose is achieved if the district court's findings are sufficient to indicate the factual basis for its ultimate conclusions." *Id.* (citations omitted). The following constitutes the findings of fact within the AR.

This action is brought forth in an effort to reinstate Plaintiff's welfare benefit plan under ERISA. (*See* Compl.)

MetLife issued the Colgate–Palmolive Welfare Benefit Plan, Group Policy No. 106240–1–G, to Plaintiff's former employer Colgate–Palmolive. (Administrative Record ("AR"), 1–86.)

The Colgate–Palmolive Welfare Benefit Plan sets forth the following provision:

**Definition of Disability**

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1. during your Elimination Period and the next 24 month period, you are unable to perform each of the essential duties of your Own Occupation; or

2. after the 24 month period, you are unable to perform each of the essential duties of any occupation for which you are reasonably qualified taking into account your training, education or experience.

(AR 25.)

On May 14, 2007, Plaintiff began working for Colgate–Palmolive Company. (AR 1191, 1403.) As the Account Business Manager, Plaintiff's job description is as follows:

● Active trade development, as necessary, to penetrate the market place.

- Direct and translate brand strategies into maximum sales results, market share, and financial return.
- Develop necessary customer marketing strategies, inclusive of consumer insights, to yield go to market bundles required to pursue new retail environments.
- Effective management of all budgets.
- Influence the customer(s) to grow sales, improve service and identify supply chain efficiencies by utilizing new techniques, tools, and information systems.
- Manage relationships between Colgate and assigned key accounts to ensure maximum profitability and to build growth.
- Communicate and execute Colgate's Corporate and Brand Strategies with the accounts.
- Work in concert with broker partners, at assigned accounts, to ensure efficiencies and manage information flow to third party retail team.

(AR 1115.)

### A. Activating Plaintiff's Short Term Benefits and Long Term Benefits

On August 17, 2009, Plaintiff stopped working for Colgate–Palmolive Company because Plaintiff was unable to perform her occupational duties due to "systemic lupus erythematosus" causing "severe fatigue, inflammatory arthritis." (AR 1348–1349.)

Because of her inability to work, Plaintiff initiated a short-term disability ("STD") benefits plan with MetLife, lasting six (6) months. (AR 1335, 1291, 1271.) According to the Plan, "STD benefits are payable for up to 180 days as long as you are considered disabled under the Plan. After 180 days, if you remain disabled, you may be eligible for benefits under the LTD Plan." (AR 73.) The benefits began on August 18, 2009 and continued through February 13, 2010. (AR 1271, 1281, 1290.) Consequently, Plaintiff initiated the LTD benefits plan with MetLife. (AR 1178–1193.)

On January 21, 2010, MetLife's claim examiner spoke with a MetLife nurse consultant who concluded that "[b]ased on [the medical file], [Plaintiff] is severe with kidney failure and in active chemo to treat her Lupus. NC [nurse consultant] indicates that it is reasonable to consider [Plaintiff] disabled." (AR 1405.)

On January 27, 2010, MetLife approved Plaintiff's LTD benefits plan. (AR 1130–1132.) The letter approving her LTD claim stated, "[y]ou became disabled on August 18, 2009. After satisfaction of the required 180 day elimination period, benefits are payable as of February 14, 2010." (AR 1130.)

In April 2010, after Plaintiff informed MetLife that she was approved for State Disability Insurance ("SDI"), MetLife informed Plaintiff that it would be offsetting Plaintiff's LTD benefits with the SDI benefits. (AR 1124–1125.)

In December 2010, Plaintiff informed MetLife that she was approved and would be receiving Social Security Disability Insurance ("SSDI") in the amount of $2,173.00. (AR 1058–1061.) In a January 5, 2011 letter, MetLife informed Plaintiff that it would be offsetting Plaintiff's LTD benefits with the SSDI benefits she was receiving. (AR 1052–1053.)

### B. Termination of Long Term Benefits

On December 13, 2011, Plaintiff's primary treating physician, Dr. Shuntaro Shinada, submitted a Physician Statement stating that Plaintiff was "expect[ing] im-

provement by the end of 2011 or early 2012." (AR 898.)

On February 13, 2012, MetLife informed Plaintiff that "[Plaintiff's] claim is terminated effective today as the restrictions received from Dr. Shinada no longer supports your disability." (AR 875.)

On April 11, 2012, Plaintiff appealed MetLife's termination-of-benefits decision. (AR 855.) Plaintiff's appeal consisted of a letter and additional medical records of her treating physician, Dr. Shinada, which stated,

> [Plaintiff] is on treatment with prednisone therapy and chemotherapy with CellCept or mycophenolate acid. She had been put on disability because of active systemic lupus erythematosus. She has headaches, severe fatigue, and joint pain that lasts all day, secondary to her underlying condition. She is serologically active with a high-titer double-stranded DNA at 800. She has a positive anti-neuronal cell antibody, as well. We extended her disability through April 7, 2012 because of her serologic activity and clinical activity. Working under stress tends to exacerbate her symptomatology and may make her disease stay worse.

(AR 855.)

To supplement her appeal, Plaintiff submitted her Social Security Administration decision approving her SSDI benefits plan. (AR 844–849.) The decision stated "[Plaintiff] has the following severe impairments: systemic lupus erythematosus, lupus nephritis, lupus cerebritis and polyarthritis ... [Plaintiff] cannot perform sustained work activity for 8 hours a day 5 days a week." (AR 846.)

On May 4, 2012, MetLife received opinions from Tracey Schmidt, M.D., certified in internal medicine and rheumatology.

(AR 836–838.) Dr. Schmidt's opinion stated the following about Plaintiff's diagnosis,

> [a]ll of the above can affect [Plaintiff's] sitting, standing, walking, lifting, work endurance and work attendance and would support an impairment to full time work in any physical demands category from 2/13/12 onward. Would restrict to working three hours a day, three days a week with sitting up to 2.5 hours a day with ability to change positions as needed, standing and walking up to 30 minutes a day with occasional lifting up to 10 pounds.

(AR 838.)

### C. Reinstatement of LTD Benefits Plan

In a May 10, 2012 letter, MetLife informed Plaintiff of the following, "[i]t has been determined that the previous claims decision will be reversed and the benefits will be reinstated." (AR 828.) On May 15, 2012, MetLife continued to state "[MetLife] [is] reinstating your [LTD] claim with no lapse in coverage. We have also completed our review to determine if you are totally disabled from performing any occupation. Based upon our review, continued LTD benefits have been approved at this time." (AR 823–824.)

### D. Plaintiff Begins Working and MetLife Terminates the LTD Benefits Plan

On August 27, 2012, Plaintiff informed MetLife that she had returned to work full-time for DeVry on August 23, 2012. (AR 1604–1605, 790.) Based on that information, MetLife closed Plaintiff's LTD Benefits claim as of August 22, 2012. (AR 790.)

At DeVry, Plaintiff was a manager of local account, which involved traveling and cold calling different government entities about DeVry. (AR 1618.) Plaintiff would stand on her feet between two to six (2–6)

hours during the course of five to seven (5 to 7) days a week. (*Id.*)

On November 12, 2012, Plaintiff went to the emergency room complaining of chest pains. (AR 769.) On November 19, 2012, Plaintiff informed MetLife that she had to stop working full-time due to recurrent symptoms of Lupus. (AR 1610–1611, 763.)

On November 27, 2012, through a letter and a medical report, Dr. Shinada informed MetLife of the following:

> We would like to put the patient off of work for at least one year from November 19, 2012, through November 19, 2013....She has significant history of lupus with multi-organ involvement, and I believe stress at work is exacerbating her symptoms, and keeping her out of work at this time would be the best option, in terms of treatment, to prevent further flares ... I believe that her stressful work environment contributes to the progression of her systemic lupus erythematosus and also to her disease flares.

(AR 767–771.)

In response, on January 22, 2013, MetLife advised Plaintiff that she had not established a basis for a recurrent disability. (AR 763–765.) Specifically, MetLife explained to Plaintiff the following:

> In summary the medical received notes you have returned to work for DeVry as a manager of local accounts working more than 40 hours a week and up to seven days a week. You have complaints of severe fatigue, headaches, joint pain and muscle pain. Dr. Shinada sent in medical records noting your testing of x-rays, EKG and echocardiogram are normal. Dr. Shinada notes you are having a flare up of lupus condition and you are unable to work from November 19, 2012 to November 19, 2013. The medical [file] received does not support that you are unable to work for a recur-

rency of your lupus condition. The exam findings of x-rays, EKG and echocardiogram are normal. The medical notes the stress of your new job and working several hours is preventing you from working. The medical [file] received does not support you are unable to work due to a flare up of your lupus condition as all the exam findings normal. The medical [file] does not indicate an impairment in working but merely notes the stress of a new job, working more than 40 hours a week and up to seven days a week is causing your symptoms of severe fatigue; headaches, joint pain and muscle pain. Therefore, your [LTD] claim remains terminated effective August 22, 2012.

(*Id.*)

### E. Plaintiff's Appeal to MetLife's Termination of LTD Benefits

In July 2013, Plaintiff appealed MetLife's determination and retained counsel to carry out the appeal. (AR 200–206.) On July 18, 2013, an appeal letter as well as 506 supporting documents were sent to MetLife. (AR 207–711.) The letter stated the following:

> These documents along with the documents already in MetLife's possession, incontrovertibly confirm [Plaintiff's] ongoing illnesses and conditions, including but not limited to systemic lupus erythematosus, class 4 lupus nephritis, lupus cerebritis with headache and pericardial effusion status post drainage as well as lupus-related headaches, severe fatigue, arthritis and arthralgia, inflammatory rash and chest pain.
>
> · · ·
>
> Dr. Shinada stated that [Plaintiff] takes the following prescription medications for the treatment of her many conditions: prednisone and CellCept. [Plain-

tiff] also takes Plaquenil. The side effects of these prescription medications, all of which have been experienced by [Plaintiff] include: dizziness, insomnia, headache, weakness, [s]welling of hands and feet, nausea and vomiting. These side effects exacerbate [Plaintiff's] inability to perform the duties of any occupation. Dr. Shinada opined that during an eight-hour day, [Plaintiff] will need to take unscheduled breaks to rest every hour for 15–30 minutes per break. This restriction and limitation alone makes clear that [Plaintiff] can no longer perform the duties of any occupation given her age, education and training, and that it is unrealistic for any employer would hire someone with such restrictions. This logical conclusion is supported by a vocational expert.

(AR 201–203.)

Within the records of the appeal, Dr. Shinada authored a July 10, 2013 letter expressing concern about the potential impact of another flare-up of Plaintiff's lupus. (AR 209–210.) With respect to Plaintiff's condition, Dr. Shinada stated,

I strongly suggest that she does not return to work as she has had many organs involved with the systemic lupus erythematosus. I believe that another organ systems involve or another flare of her systems may have dire consequences. For example, if she has flare of her cerebritis, this may affect her mental function as well as may lead to neurologic problem[s] such as paralysis or stroke which may have devastating consequences. If her kidney disease flares up again, since this will be the second insult, we are concerned that she will develop progressive renal problems and possibly renal failure.

(*Id.*)

To further supplement her appeal, Paul Broadus, a vocational expert with Broadus & Associates, completed an Employability Analysis on July 17, 2013, which stated the following,

Given all of these factors, it is not difficult to see why Dr. Shinada concludes that [Plaintiff] is permanently disabled, and that she cannot tolerate employment of any type. To her credit, even with all of these problems, she attempted a return to work. However, a regular schedule proved to be too much for her, and she had to quit after three months.

Accordingly, due to the abnormal exam findings, diagnostic test results and documented restrictions and limitations reported by Dr. Shinada, she is prevented from working in even a sedentary occupation, and is therefore unable to perform the material duties of any occupation.

(AR 698–706.)

## F. MetLife's Review of Plaintiff's Appeal and Decision to Uphold its Determination to Terminate Plaintiff's Benefits

As part of its review of the administrative appeal, MetLife advised Plaintiff that MetLife would render its decision with the assistance of an "Independent Physician Consultant" from Network Medical Review Co. Ltd. ("NMR"). (AR 196.) The physician of NMR is named Rajendra Marwah, M.D. Dr. Marwah is board certified in internal medicine and rheumatology. (AR 177–189.)

Dr. Marwah sent a report to MetLife evaluating Plaintiff. (*Id.*) Within the report, Dr. Marwah related his telephone conversation with Dr. Shinada during which they discussed Plaintiff's diagnoses, symptoms and reasons why she could not return to work. (AR 147.) The phone conversation lasted ten (10) minutes. (*Id.*) Dr. Marwah noted the following:

[Plaintiff] has tried to return to work and this has been difficult for her despite her best effort. Dr. Shinada feels that she will not [be] able to cope with her job as a business administrator. She did try an alternative job for a few weeks, could not cope.

. . .

When I questioned as to why [Plaintiff] could not return to work, Dr. Shinada responded that the chief problem preventing her from working was the ongoing fatigue, arthralgia, myalgias, headaches, and dizziness. Dr. Shinada was questioned about her medical status in November 2012 and the progress notes indicated she was doing well. Dr. Shinada responded that the patient's subjective complaints had persisted.

When I mentioned the possibility of fibromyalgia accounting for [Plaintiff's] myalgias, arthralgias, and ongoing fatigue, Dr. Shinada responded that it was a possibility. [Dr. Shinada] had not done any formal evaluation regarding this diagnosis and specifically [Plaintiff] was not in any specific therapy for the fibromyalgia.

(*Id.*)

Based on the conversation with Dr. Shinada, Dr. Marwah concluded the following:

To summarize, review of the records provided and the phone discussion with Dr. Shinada indicates that [Plaintiff] has been stable from her systemic lupus erythematosus standpoint since 11/18/12. But it was indicated she complained ongoing fatigue, weakness, arthralgias, recurring headaches, and inability to cope with the stressful work environment. Dr. Shinada confirmed that it was a possibility of fibromyalgia, but no specific work up was done regarding this diagnosis and [Plaintiff] was not in any specific therapy for the fibromyalgia. Based on the clinical information from

the file and discussion with the treating provider, the patient's clinical profile most suggestive of fibromyalgia. Due to these findings, she could return to work on a [full time] basis, eight hours a day for the full work week with appropriate restrictions and limitations.

(AR 154.)

Plaintiff's attorneys and Dr. Shinada submitted responses to Dr. Marwah's report, which were provided to Dr. Marwah. (AR 107–108.) In considering these responses, Dr. Marwah stated Dr. Shinada's opinion of Plaintiff remaining off work from November 10, 2012 through November 19, 2013 "is purely subjective and has no objective basis or rationale." (AR 107.) Dr. Marwah concluded that his findings "remain unaltered upon review of Dr. Shinada's critique. . . ." (AR 108.)

To assist in the review of the appeal, MetLife also employed CorVel Corporation ("CorVel"), a Vocational Rehabilitation Consultant, to conduct an employability and labor market analysis. (AR 133.) CorVel uses a software program that matches a worker's skills and abilities to occupations listed in the Dictionary of Occupational titles, and provides crosswalks to Occupational Employment Statistic data, Occupational Outlook projections, Job Banks, and other sources of occupational information. (*Id.*) Considering the skills, abilities, and medical history of Plaintiff, CorVel concluded that Plaintiff has the functional ability to work at different sedentary positions such as Manager of Sales, Contract Administrator, Manager of Advertising, and a Manager of Merchandise. (*Id.*) All the positions are sedentary positions because of Plaintiff's systemic lupus erythematous. (*Id.*)

Considering the reports above and Plaintiff's entire file, on October 24, 2013, MetLife rendered its final decision regard-

ing the appeal. (AR–89–98.) MetLife sent a letter explaining its decision as follows:

> In conclusion, upon completion of a thorough review of all the information contained in your client's claim file, taking into consideration the IPC [independent physician consultant's] findings and the VRC [vocational rehabilitation consultant] review, it was determined that the medical evidence on file showed that [Plaintiff] can work full time in a sedentary occupation. As a result, the medical documentation on file failed to support restrictions and limitations that would prevent [Plaintiff] from performing each of the essential duties of any occupation for which she is reasonably qualified taking into account her training, education or experience. Therefore, your client does not meet the Definition of Disability for the recurrent time period beyond November 18, 2012 and your client's claim will remain terminated.

(*Id.*)

As a result of MetLife's final ruling, Plaintiff filed suit in this court on December 11, 2013. (*See* Compl.)

## II. STANDARD OF REVIEW AND BURDEN OF PROOF

■ Under Federal Rules of Civil Procedure ("FRCP") 52, the Parties move for judgment in their respective favors regarding Plaintiff's ERISA claims. Under FRCP 52, the Court conducts a bench trial on the record, evaluating the persuasiveness of the arguments and deciding which is more likely true. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999).

In implementing ERISA, Congress intended to adopt a uniform set of standards in the administration of employee benefit plans. *Menhorn v. Firestone Tire & Rubber Co.*, 738 F.2d 1496, 1498 (9th Cir.1984).

Congress empowered federal courts to develop a body of federal common law consistent with ERISA's purpose. *Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956, 962 (9th Cir.2001).

Under ERISA, a beneficiary may sue "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

■ A court reviews the benefit plan de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits;" if the plan does grant such discretionary authority, the Court reviews the administrator's decision for abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir.2011).

■ On July 10, 2014, this Court ruled that the standard for judicial review is de novo. (Dkt. No. 35.) The Court determines whether the plaintiff is entitled to benefits based on the evidence in the administrative record. *Kearney*, 175 F.3d at 1087–1090.

■ Under the de novo standard of review, the Court gives no deference to MetLife's decision in terminating Plaintiff's benefits. Instead, the Court must decide whether Plaintiff is entitled to benefits. "In an ERISA case involving de novo review, the plaintiff has the burden of showing entitlement to benefits." *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F.Supp.2d 1151, 1162 (N.D.Cal.2010); *see also Muniz v. AMEC Constr. Mgmt.*, No. CV–07–8066 CAS (AJWx), 2009 U.S. Dist. LEXIS 26970,

2009 WL 866843, at \*5 (C.D.Cal. Mar. 30, 2009) ("Generally, a plaintiff suing for benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), must establish his entitlement to benefits." citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir.1992)).

■ The review is limited to the evidence in the administrative record. *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007). The Court analyzes the record anew and "evaluate[s] the persuasiveness of conflicting testimony and decide which is more likely true." *Kearney*, 175 F.3d at 1095.

### III. CONCLUSIONS OF LAW

■ The Court's review of the administrative record and the Parties' arguments establishes that, at the time Plaintiff's benefits were terminated, she was disabled under Defendant's plan definition.

### A. Analysis of Plaintiff's Disability

The Plan defines disability as the following:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1. during your Elimination Period and the next 24 month period, you are unable to perform each of the essential duties of your Own Occupation; or

2. after the 24 month period, you are unable to perform each the essential duties of any occupation for which you are reasonably qualified taking into account your training, education or experience.

(AR 25.)

### 1. Plaintiff's Prior Finding as Disabled is Significant

Spanning from 2009 to 2012, Plaintiff and MetLife have spiraled down a path of approvals and denials under the Plan. In determining whether Plaintiff was disabled at the time MetLife terminated her benefits, the Court begins with MetLife's STD benefits approval from August 18, 2009 through February 13, 2010. (AR 1271, 1281, 1290.) The medical file available to MetLife, at the time of the approval, indicated that Plaintiff was disabled. After the STD 180 day allotment under the Plan, on January 27, 2010, MetLife approved Plaintiff's LTD benefits plan. (AR 1130–1132.) On August 22, 2012, MetLife terminated Plaintiff's LTD Benefits Plan. (AR 790.) Therefore, during the period from August 18, 2009 until August 22, 2012, there is no dispute that Plaintiff was in fact disabled for which she received STD and LTD benefits.[1] (AR 790;1178–1193; 1405, ("NC [nurse consultant] indicates that it is reasonable to consider [Plaintiff] disabled.")). Moreover, since MetLife relied on the record in determining Plaintiff was disabled in the past, the Court presumes MetLife relied on a significant change in the circumstances of Plaintiff's condition in order to recant its previous approvals. *See McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the

---

1. There was a gap between the time period to which Plaintiff's plan was terminated and then reinstated. On February 13, 2012, after Dr. Shinada informed MetLife that Plaintiff was recovering steadily, MetLife informed Plaintiff of the termination of her LTD benefits. (AR 875.) On April 11, 2012, Plaintiff appealed MetLife's termination decision, and Plaintiff was reinstated in May 2012. (AR 823–828; 855.)

previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

Plaintiff argues that because MetLife was previously paying Plaintiff LTD benefits, MetLife has a higher burden in justifying the termination of benefits. (Pl. Br., p. 2); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir.2008). Although *Saffon* does not mandate a higher burden of proof *per se*, its analysis is instructive.

In *Saffon*, the plaintiff suffered from a degeneration of her cervical spine, which granted her LTD benefits under the plan. *Id.* After paying LTD benefits for a year, the defendant informed the plaintiff that "she no longer m[et] the definition of disability" and terminated her LTD benefits. *Id.* at 866. After an unsuccessful appeal, the plaintiff sued, and a district court concluded that the defendant did not abuse its discretion. *Id.* On appeal, the Ninth Circuit remanded the case back to the district court in order to allow the plaintiff the opportunity to supplement the record with additional outside evidence. *Id.* at 873–874.

Here, the record up until this point clearly demonstrated Plaintiff's disability and as a result, MetLife provided STD and LTD for nearly three (3) years. *See McOsker*, 279 F.3d at 589. Therefore, this Court would expect MetLife to provide some evidence of Plaintiff's medical progression at the time of MetLife's termination of LTD benefits. *Schramm*, 718 F.Supp.2d at 1164 ("Although Defendant did not need to prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack of consistent, marked progress is probative of her continuing disability.").

## 2. Plaintiff was Disabled Under the Terms of the Plan at the Time of the Denial of Benefits

The Court's review of the administrative record strongly indicates that Plaintiff has a history of systemic lupus erythematosus. (*See* AR.) MetLife acknowledges that Defendant has lived with the systemic lupus erythematosus condition since being diagnosed in 1990. (Def. Br., p. 1 ("[Defendants] acknowledge that [Plaintiff] has a medical condition that she has lived with since 1990 (Lupus), and that she suffered a disabling flare up in August 2009.")). Plaintiff's treating physician, Dr. Shinada, is Plaintiff's primary source in identifying her with Lupus and substantiating her LTD benefits claim. Dr. Shinada has detailed the symptoms that Plaintiff has suffered from to include, but are not limited to, bad chest pains, migraine headaches, ongoing fatigue, arthritis and arthralgia, inflammatory rashes. (*Id.* at 201–203.) Dr. Shinada ultimately concludes that Plaintiff's condition precludes her from returning back to work. (AR 209–210.) Due to the incident on November 12, 2012, Dr. Shinada believes that Plaintiff may suffer from another flare up of her cerebritis, which may affect her mental function as well as may lead to neurological problems such as paralysis or stroke. (AR 202.)

Although their diagnoses somewhat differed, both physicians, Dr. Marwah and Dr. Shinada, agree that Plaintiff suffered from the symptoms mentioned above. Dr. Shinada has opined that Plaintiff suffered from "ongoing illnesses and conditions, including but not limited to systemic lupus erythematosus, class 4 lupus nephritis, lupus cerebritis with headache and pericardial effusion status post drainage as well as lupus-related headaches, severe fatigue, arthritis and arthralgia, inflammatory rash and chest pain." (AR 201–203.) Dr. Mar-

wah has stated that the medical record displayed that Plaintiff "complained [about] ongoing fatigue, weakness, arthralgias, recurring headaches, and inability to cope with the stressful work environment." (AR 154.) These symptoms support Dr. Shinada's finding that Plaintiff cannot return to work because it is these symptoms that carry on throughout the time in question.

The Court contextualizes its analysis with the undisputed fact that Plaintiff suffers from lupus. "Physicians recognize lupus as an incurable autoimmune disease set off when something goes wrong with the body's immune system and antibodies that normally fight germs begin to attack healthy tissue." *Kennedy v. Collagen Corporation,* 161 F.3d 1226, 1229 (9th Cir. 1998); *see also Lopez v. Colvin,* No. ED CV 13–1753–DFM, 2014 WL 1370672, n. 2 (C.D.Cal. April 7, 2014) ("Lupus or systemic lupus erythematosus is a chronic autoimmune disease in which the body's immune system mistakenly attacks healthy tissue. The most common symptoms of lupus are joint pain, inflammation, and swelling." (citing Systemic Lupus Erythematosus, PubMed Health (last reviewed Feb. 21, 2013), http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001471/.)). It is evident to the Court that the chronic nature of the lupus condition causes the reoccurrence of the symptoms cited above. While MetLife claims that Dr. Shinada's reports have been inconsistent (Def. Br., p. 13), the symptoms manifestly improve and digress at various times, in fact Dr. Shinada has reported that Plaintiff may have "good days" and "bad days" with her disability. (AR 216.)

MetLife asserts various arguments. MetLife contends that Plaintiff's medical condition alone does not mean Plaintiff is disabled as defined in the Plan. (*Id.*) MetLife also argues that Plaintiff took a job that was not appropriate for her condition, which is why the incident occurred. (Bench Trial Transcript ("BT"), Dkt. No. 54.) Moreover, MetLife questions the linkage between the stress that caused the November 2012 incident and that of Plaintiff's lupus condition. (*Id.* at 15:5–16 ("In contrast when you look at the relevant time, November of 2012, there aren't biopsies or ultrasounds or lab work. There is no objective evidence saying she's in the middle of a flare-up ... if you look at the actual records ... there is really no evidence that this was a recurrence of lupus. It was stress. She took too stressful a job.")). MetLife's arguments of the lack of objective testing and the lack of evidence demonstrating that lupus caused November 2012's incident are consistent with Dr. Marwah's opinion.

In upholding the denial of benefits, MetLife relied on Dr. Marwah's opinion and the lack of objective testing on the part of Dr. Shinada. (AR–89–98.) Dr. Marwah concluded that no objective evidence supporting a disabling recurrence of lupus in November 2012 or thereafter could be found within Plaintiff's medical record, and that Plaintiff's condition more closely resembles fibromyalgia.[2] (AR 147–154.) According to Dr. Marwah, Dr. Shinada's observations are based on Plaintiff's subjective complaints, and the medical reports within the AR do not support the assertion that Plaintiff is disabled. (Def. Br. at 12.) Furthermore, Dr. Marwah and MetLife claim that Dr. Shinada did not provide the objective evaluations needed in order to

---

**2.** "Fibromyalgia indicates pain in fibrous tissues, muscles, tendons, ligaments, and other sites ..." and is "characterized by achy pain, tenderness and stiffness...." *Munn v. Com-* *missioner of Social Sec.,* No. 1:06–CV–231 (LEK/DRH), 2008 WL 2242654, at fn. 5 (N.D.N.Y.2008) (citing THE MERCK MANUAL 481 (17th ed.1999)).

come to the conclusion that Plaintiff should not work. (*Id.*) MetLife points to the change in circumstances surrounding Dr. Shinada's reports between August 2009 and November 2009. (Def. Br. pp. 10–11.) Specifically, in August 2009, MetLife notes that Plaintiff's disability was determined through objective testing such as a renal ultrasound, a kidney biopsy, and a serum creatinine level at 1.5 mg/dL. (*Id.*) However, in November 2009 and so forth, Dr. Shinada has relied solely on Plaintiff's subjective complaints and a Residual Functional Capacity Questionnaire, which is devoid of any medical test results. (*Id.*) However, from the Court's perspective, for MetLife to terminate Plaintiff's LTD benefits because her treating physician relied on her subjective complaints are questionable bases. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir.1989) (In a Social Security Benefits case, the Ninth Circuit stated that "pain is a subjective phenomenon [and] it is possible to suffer disabling pain even where the *degree* of pain, as opposed to the mere *existence* of pain, is unsupported by objective medical findings.").

Plaintiff's condition has been supported through objective testing in the past, most recently between September 2009 and October 2009. (AR 149; 349–353.) For example, on September 18, 2009, Dr. Shinada examined Plaintiff's blood and urine chemistry to observe Plaintiff's white blood cell count, urine creatinine, and other antibodies that resembled signs of Lupus. (AR 351 ("Other antibodies that were tested was an anti-neural antibody which [was] positive [and] consistent with lupus cerebritis.")). On October 6, 2009, a nephrologist named Dr. Arshia Ghaffari conducted a kidney biopsy on Plaintiff, which also showed signs consistent with lupus. (AR 149 ("[Plaintiff] had a kidney biopsy performed on 10/06/09 that showed changes consistent with lupus nephritis class 4 with mild interstitial nephritis.")). Dr. Shinada

also agreed with Dr. Ghaffari's findings, noting that "[Plaintiff] did have a kidney biopsy done [on] October 6, 2009, which showed adequate biopsy, 18–21 glomeruli present in different sections and 2 cores of renal cortex, diffuse segmental to global proliferative and sclerosing glomerulonephritis consistent with lupus nephritis class 4...." (AR 345.) MetLife argues that these objective measures that reinforced Plaintiff's disability need to be frequently taken in order to prove that Plaintiff has a disability. (Def. Br. pp. 10–11.) Yet, the Court does not see what Dr. Shinada and Plaintiff can accomplish by continuing to take objective testing after already objectively finding that Plaintiff suffers from this chronic illness. Dr. Shinada's opinions may primarily derive from Plaintiff's subjective complaints, but the subjective complaints sustain the objective testing previously explored. It is the objective testing that substantiated Plaintiff's condition, and Plaintiff's subjective complaints support those symptoms. The preponderance of the evidence within the AR suggests that Plaintiff's subjective complaints derive from Plaintiff's condition and the symptoms associated with that condition. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675–677 (9th Cir.2011) (The Ninth Circuit reversed the plan administrator's denial because each physician that examined the plaintiff determined that he was disabled and the plan administrator's demand for objective testing were illogical "because such objective measures as blood tests are used to rule out alternative diseases, not to establish the existence of [the medical condition]."); *Oster v. Standard Insurance Company*, 759 F.Supp.2d 1172, 1185 (N.D.Cal.2011) ("In an ERISA action, the plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under

the terms of the Plan during the claim period.").

The fact remains that over a three (3) year period the medical record supports the assertion that Plaintiff suffered from lupus that caused physical symptoms that contributed to her being disabled. MetLife argues that Plaintiff's medical experience should not serve as a "free card of now I never have to work again" and cites a professional baseball player and a former President as examples of individuals able to function with a medical condition. (BT 39:1; Def. Br. p. 15 (noting that Tim Raines had lupus and continued to play baseball and that the late President Franklin D. Roosevelt continued to stay in office despite his medical condition)). This Court does not view the mere diagnosis of lupus as a disability that requires LTD benefits. Rather it is the extent of the symptoms associated with lupus that render one disabled. MetLife cannot ignore the fact that Plaintiff has both the condition and the associated symptoms because MetLife determined Plaintiff was disabled in 2009 due to this very medical condition. (AR 1271, 1281, 1290.) The Court also rejects the inference MetLife draws from its examples because if MetLife's logic was correct then Plaintiff would have not received any LTD benefits to begin with.

The Court questions whether due consideration was given to Plaintiff's overall medical history.[3] Although Dr. Marwah reviewed Plaintiff's medical records, he did not examine Plaintiff in-person. Instead, Dr. Marwah's conclusion was based in part on a ten (10) minute conversation between Dr. Marwah and Plaintiff's treating physician.[4] Yet, Dr. Marwah ignores Plaintiff's

3. Dr. Marwah opines that Plaintiff may have fibromyalgia. Yet, whether individuals with fibromyalgia are disabled or can perform their occupational duties is not an inquiry Dr. Marwah accounts for. For instance, the Seventh Circuit articulated that "[s]ome people may have such a severe case of fibromyalgia as to be totally disabled from working...." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (citations omitted). The Second Circuit "ha[s] recognized that fibromyalgia is a disabling impairment and that there are no objective tests which can conclusively confirm the disease." *Green–Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir.2003). Although both of these cases were in the realm of Social Security Benefits, this Court cannot rely on Dr. Marwah's fibromyalgia diagnosis in reviewing the administrative record because the fibromyalgia diagnosis may have equally disabling effects on Plaintiff. More importantly, even though Dr. Marwah concluded that Plaintiff suffers from Fibromyalgia, MetLife still acknowledges that Plaintiff suffers from lupus.

4. At the hearing and within their papers, MetLife and Plaintiff appeared to suggest an indication of bias. Plaintiff takes the position that Dr. Marwah has an incentive in making these determinations because MetLife has a long history of business consulting with NMR, Dr. Marwah's employer. (Pl. Br., p. 4.) Plaintiff cites caselaw that mentions MetLife paying over $11 million to NMR during a period of time to conduct medical reports of MetLife's beneficiaries. (Pl. Reply, p. 9 (citing *Walker v. Metropolitan Life Ins. Co.*, 585 F.Supp.2d 1167, 1175 (N.D.Cal.2008))). Defendant opposes Plaintiff's assertion that Dr. Marwah is biased because of MetLife's business relationship with NMR. (Def. Br., p. 17.) According to MetLife, the fact that MetLife has retained NMR as a third party vendor for a long period of time does not infer a finding of bias. (*Id.* at p. 18 (citing *Nolan v. Heald College*, 745 F.Supp.2d 916, 923 (N.D.Cal. 2010))). In contrast, Defendant states that the record may infer bias on the part of Dr. Shinada because of Dr. Shinada's inconsistent reporting. (*Id.* at p. 19; p. 13 ("[S]ometimes a patient's regular physician may want to do a favor for a friend and client, and find disability too quickly. (citation omitted)")). The record does not suggest bias in either physician. The cases cited support this conclusion. As stated in *Nolan*, the record cannot infer a history of bias based on statistics alone. *Nolan*, 745 F.Supp.2d at 923 ("In the context of a larger inquiry, the statistics before the court do not sustain a finding of bias, because they do not on their own support an inference that a similar pool of claims reviewed by a different set of physicians would

longstanding medical history and complications which stem from a disability that MetLife acknowledges less than three (3) months earlier. (AR 790; cf. AR 823–824.) The Court notes that MetLife is not required to have Dr. Marwah conduct an in-person examination in order to determine its findings. (Def. Br., p. 23.) However, when considering Plaintiff's medical history, the Court notes that Plaintiff went to the emergency room complaining of chest pains shortly after attempting to return to work; her treating physician of nearly five (5) years opined that Plaintiff's significant history of lupus was such that stress at work was excarberating her already serious prior symptoms; and it was best to put Plaintiff off work for at least one year.[5] Meanwhile, Dr. Marwah has not met with Plaintiff nor talked with Plaintiff about the above. Dr. Marwah has only consulted Dr. Shinada for a short window of time while reviewing the AR, despite the fact that Dr. Shinada has been treating Plaintiff since 2007.[6] (AR 95.) While ERISA does not dictate that deference be given to the opinions of a treating physician, the Court deems that Plaintiff's overall medical history presents reliable evidence to support a LTD finding. *See Black & Decker Disability v. Nord,* 538 U.S. 822, 822, 834 123 S.Ct. 1965, 1965–66 155 L.Ed.2d 1034 (2003) (The Supreme Court concluded that "ERISA does not require plan administrators to accord special deference to the opinions of treating physicians[,]" but nonetheless, "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician.").

Another notable point is that Dr. Marwah's opinion predominantly draws from Dr. Shinada's August 2012 and November 2012 reports, but reaches a different overall conclusion than Dr. Shinada. (AR 153 ("While Dr. Shinada writes in his report 11/27/12 that [Plaintiff] had ongoing severe fatigue, headaches, joint pain, and muscle pain, the report of 12/18/12 indicated that she was doing well.")). Dr. Marwah con-

---

have had a lower denial rate."). Plaintiff has not supplied the Court with a record that demonstrates a history of bias nor has Defendant adequately put forward anything that establishes bias on the part of Dr. Shinada. Therefore, the Court does not take such arguments into account when determining Plaintiff's entitlement to LTD benefits. *Saffon,* 522 F.3d at 868 ("The district court didn't take MetLife's conflict of interest into account, apparently because [plaintiff] didn't produce 'material, probative evidence' of the conflict." citing *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1323 (9th Cir.1995)).

5. Dr. Shinada has observed and examined Plaintiff, on average, seven (7) to nine (9) times a year. (*Id.*) Dr. Shinada's observations focus on, *inter alia,* Plaintiff's vision, leg swelling, chest pains, bowel movements, menstrual cramping, and joint pains. (AR 332–336.)

6. Having reviewed Dr. Marwah's opinion, the Court questions whether Dr. Marwah considered Plaintiff's symptoms and side effects in determining that Plaintiff could perform full-time sedentary work. Specifically, Dr. Marwah expressly noted that he could not locate a consultation report in the record, which suggests that the report was not considered in Dr. Marwah's final opinion. (AR 178 ("The neurology consultant listed in the records Dr. Sanossian, I could not find his consultation report in the record provided.")). MetLife considers this to be a red herring. (Def. Br., p. 24.) Dr. Sanossian is a neurologist who treated Plaintiff's migraines in 2011, which is one of Plaintiff's symptoms. (AR. 836.) As MetLife acknowledges, Dr. Sanossian's report likely would not have been a heavily weighed factor in Dr. Marwah's opinion because Dr. Sanossian submitted the reports before the LTD benefits termination occurred and none of the reports conclude that Plaintiff could not work full-time. (*Id.*) However, for MetLife to heavily rely on Dr. Marwah's opinion and for Dr. Marwah not to consider the entire medical record is cause for concern.

cludes that "[Plaintiff] has been stable from her systemic lupus erythematosus standpoint since 11/18/12" and "[Plaintiff] could return to work on a [full-time] basis...." (AR 154.) MetLife also asserts that Plaintiff is stable and stresses to the Court the importance of focusing on the relevant time in reviewing the AR. (BT 28:18–21.)

Dr. Shinada's August 20, 2012 and November 2, 2012 reports state that Plaintiff is stable and improving. (*See* AR 235) ("Doing well. Saw the patient last week. No headaches. No visual problems. No numbness, no tingling. No joint pain."; AR 778 ("[c]urrently doing well. [Plaintiff] is back to work")). MetLife argues that the medical records at the relevant time provide no description of disabling symptoms. (BT 23:15–17.) Yet, on November 27, 2012, MetLife received a letter from Dr. Shinada that stated that Plaintiff's condition was exacerbated because she began to work. (AR 767–68.) The letter explicitly says "[Plaintiff] cannot tolerate a full job. She is under a lot of stress and this causes a flare in her symptoms." (AR 767.) On November 19, 2012, Dr. Shinada completed a medical report, which also concluded that Plaintiff should not return to work full-time because working exacerbates her symptoms. (AR 770 ("I believe stress at work is exacerbating her symptoms, and keeping her out of work at this time would be the best option, in terms of treatment, to prevent further flares.")). While Dr. Shinada has opined that Plaintiff has improved in the past, MetLife is certainly not suggesting that the Court be bound to Dr. Shinada's reports in August 20, 2012 and November 2, 2012 in examining the record.

The Court understands that by the very nature of lupus, Plaintiff will likely have "good days" and "bad days." (AR 216.) For instance, focusing on November 2012, the Court notes that earlier in the month Dr. Shinada described Plaintiff's improvement, and later in the month, Dr. Shinada described Plaintiff's regression due to her return to work. (AR 778; 770.) The change in positions were a direct result of Plaintiff going to the emergency room on November 12, 2012, which Dr. Shinada believes is in relation to her symptoms. (AR 769.) This is similar to when Plaintiff worked for Colgate–Palmolive Company from May 2007 to August 2009 where Plaintiff's symptoms caused her to stop working. (AR 1191, 1348–1349; 1403.) The Court can also point to events surrounding Plaintiff's LTD benefits reinstatement. (AR 823–828; 855.) After receiving Dr. Shinada's records that reported Plaintiff's steady improvement, MetLife terminated Plaintiff's LTD benefits in February 2012. (AR 875.) On appeal, after Dr. Shinada opined that "[w]orking under stress tends to exacerbate [Plaintiff's] symptomatology and may make her disease stay worse," MetLife reinstated Plaintiff's benefits plan in May 2012. (AR 855; 875.) With these events in mind, the Court can surely point to a period of time where Plaintiff was stable or when Dr. Shinada changed his medical stance regarding Plaintiff's condition. However, because Plaintiff is stable at various points does not mean that the debilitating symptoms will not be exacerbated if Plaintiff returns to work on a full-time basis.

Additionally, Plaintiff argues that her SSDI benefits should have been given deference in supporting Plaintiff's claim. (See Pl Reply.) MetLife's policy requires Plaintiff to apply for the SSDI benefits. (AR 48–51.) During the course of Plaintiff's initial LTD benefits plan, MetLife offset its benefits plan with Plaintiff's SSDI benefits. (AR 1455.) However, according to MetLife, no deference was given to the social security administration's

finding that Plaintiff was entitled to these benefits. (Def. Br., pp. 1, 21.) MetLife argues that it is not required to defer to Plaintiff's SSDI award in conducting its own independent review. (*Id.*)

A similar circumstance was presented in *Schramm*, where the Court concluded that the SSDI benefits do suggest some limitation in the plaintiff's ability to work. *Schramm*, 718 F.Supp.2d at 1165. Here, the Senior Attorney Advisor of the Social Security Administration determined that Plaintiff was disabled, under the Social Security Act, since August 18, 2009. (AR 849.) MetLife correctly notes that no deference needs to be provided to Plaintiff's SSDI claim. The standards of the Plan and the standards of the Social Security Administration likely differ, but that does not mean that the decision should be disregarded in its entirety. *Mossler v. Aetna Life Ins. Co.*, CV 13–01945 SJO (MRWx), 2014 WL 3587511, at *16, 2014 U.S. Dist. LEXIS 89046, at *45 (C.D.Cal. July 21, 2014) (considering the plaintiff's SSDI award because the decision constituted additional support in determining plaintiff's benefit entitlement. (citing *Schramm*, 718 F.Supp.2d at 1165)). Albeit with the distinction in standards, Plaintiff's SSDI award suggests that she bears some restriction in her capability to work. The Court acknowledges that this award is not dispositive, but the SSDI award does help Plaintiff's showing that she is disabled.

Under de novo review, the Court reviews the entire record while affording no deference to MetLife's prior decisions. *See Opeta*, 484 F.3d at 1217. MetLife concluded that Plaintiff is not disabled based on the opinion of a independent physician that minimally corresponded with the treating physician, did not conduct an in-person examination, and focused on particular time period without considering the entire record. On the other hand,

Dr. Shinada has supplemented the record with reports, objective and subjective, that indicate that Plaintiff suffers from a chronic illness that worsens when she works on a full-time basis. Moreover, Dr. Shinada has stated that the November 2012 incident was interrelated to Plaintiff's condition and recommended she not work for a year. (AR 767.) The Court understands that none of these events are decisive, individually. However, taking the entire record into account, the Court is hard-pressed not to find Dr. Shinada's reports more influential, especially in light of MetLife's past determination that Plaintiff was disabled. *See McOsker*, 279 F.3d at 589 ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

### 3. Plaintiff Cannot Work in An Occupation To Which She Qualifies

Finally, based on the AR, the Court finds that Plaintiff is unable to participate in any occupation, to which she qualifies.

Plaintiff claims that her return to work was short lived because of the high stress levels at her job and her lupus condition. (Pl. Br., p. 2.) Plaintiff believes that MetLife is terminating her based on her unsuccessful attempt to return back to work. (Pl. Reply, p. 16.) Plaintiff relies on Paul Broadus, a vocational expert with Broadus & Associates. (AR 698–706.) Mr. Broadus concluded, through his Employability Analysis, "due to the abnormal exam findings, diagnostic test results and documented restrictions and limitations reported by Dr. Shinada, she is prevented from working in even a sedentary occupation, and is therefore unable to perform the materials duties of any occupation." (*Id.*)

MetLife's reassessment of Plaintiff's disability occurred after Plaintiff informed MetLife that she was returning back to work. Defendant articulates the definition of disability as a "medical condition [that] create[s] an impairment, and that impairment must prevent [Plaintiff] from performing each of the essential duties of any gainful occupation for which she is reasonable qualified." (Def. Br., p. 1.) MetLife contends that Plaintiff worked a non-sedentary and highly strenuous position at DeVry that required her to travel and stay on her feet for an extensive period of time. (*Id.* at pp. 13–14.) However, no evidence indicates that Plaintiff cannot perform another occupation, specifically a sedentary occupation. (*Id.*) According to MetLife, the question is whether Plaintiff can perform the essential duties of any occupation for which she is reasonably qualified. (*Id.* at 1.) The fact that Plaintiff has failed in her return back to work is not dispositive in determining Plaintiff is disabled. (*Id.* at 13.) Additionally, a portion of MetLife's termination decision relies on CorVel, which conducted an employability and labor market analysis on Plaintiff. (AR 133.) CorVel concluded that based on Plaintiff's education, employment history, and medical condition, Plaintiff is able to work a number of sedentary positions despite her condition. (*Id.*) MetLife concludes that without evidence indicating Plaintiff has attempted to work a sedentary job and has failed to function due to her medical condition, Plaintiff cannot assert that her medical condition precludes her from working these positions. (Def. Br., p. 2.)

Based on the record before it, the Court does not believe Plaintiff could perform either the essential duties at her own occupation or the essential duties of any occupation to which she is reasonably qualified, taking into account her training, education, and experience. As CorVel noted in its analysis, Plaintiff has a Bachelor of Science Degree in Marketing and has extensive work experience including, but not limited to, serving as a manager of sales and a sales service promoter. (AR 133.) Her skills and her qualifications speak to Plaintiff's ability to perform sedentary work. *Perryman v. Provident Life & Accident Ins. Co.,* 690 F.Supp.2d 917, 948 (D.Ariz.2010) (elaborating on "sedentary work, as defined by the [Department of Labor's] Dictionary of Occupational Titles, 'involves sitting most of the time....' "). Yet, CorVel does not provide an adequate explanation or examples of how Plaintiff is to perform the essential duties of an occupation with the limitations of her medical condition. Based on the record, it appears that Plaintiff has made numerous efforts to continue to work and has tried various jobs to no avail. It also appears, and Dr. Shinada confirms, that stress impacts Plaintiff's medical condition so severely that she needed to cease from working. With that in mind, the Court has difficulty envisioning a job similar in nature or one that she is reasonably qualified for that would not cause medical flare-ups to Plaintiff's lupus.

The Court is not convinced that Plaintiff can work any of these positions cited in CorVel's report, or any sedentary job, on a full-time basis because of a few notable facts. For instance, Plaintiff went to the emergency room working her last job, which indicates that her symptoms can severely affect her work to the point where she is missing workdays or she is hospitalized. (AR 216 (In filling out the Residual Functional Capacity Questionnaire, Dr. Shinada notes that on average Plaintiff is to miss work more than three (3) times a month.)). Additionally, Plaintiff is clearly limited in performing her occupational duties. In CorVel's employability and labor market analysis, CorVel partially relied on Dr. Marwah's opinion in

concluding that Plaintiff could work on a sedentary job on full-time basis. (AR 134 ("According to the medical information in the MetLife case notes provided for review, a Physician File Review was completed by Dr. J. Marwah. Dr. Marwah opined that Ms. Bledsoe could return to work on a full-time basis, 8 hours a day for the full work week.")). The report continues to rely on information that Plaintiff can take "5 minute breaks each hour to stand and stretch. She could stand for 20 minutes at a time for a total of 2 hours during the workday. She is able to walk up to an hour during the 8 hour work day." (*Id.*) Plaintiff states that Dr. Shinada opined that Plaintiff may likely need to take a break per hour that could last up to thirty (30) minutes. (AR 201–203.) The employment assessments, Dr. Marwah, and Dr. Shinada clearly demonstrate that Plaintiff cannot work long periods of time without accommodations. Even if Plaintiff had the opportunity to take the breaks she needs to and stretch when needed, CorVel and MetLife appear to assume that Plaintiff could complete her sedentary duties while either standing or walking for a portion of her workday. *Brooking v. Hartford Life & Accident Ins. Co.,* 167 Fed. Appx. 544, 548–49 (6th Cir.2006) (in an ERISA case involving that the plaintiff's entitlement to LTD benefits, the Court concluded that the plaintiff's inability to sit for more than four hours during an eight-hour day rendered her incapable of performing sedentary work). These restrictions affect her productivity and her overall ability to perform her job. *Alfano v. CIGNA Life Ins. Co. of New York,* 07 Civ. 9661(GEL), 2009 WL 222351, at *18 (S.D.N.Y. Jan. 30, 2009) (noting that a sitting tolerance of "6 hours per day [is] generally recognized as the minimum tolerance required for sedentary work" according to the Department of Labor). Consequently, CorVel's analysis and the totality of the record do not amount to an individual who could work a full-time position for which Plaintiff is qualified for.

The Court is not convinced that Plaintiff can work any of the positions cited in the CorVel report and finds that the evidence within the AR is insufficient to support the termination of Plaintiff's benefits. Because the Court concludes that the evidence within the AR supports a finding of LTD benefits, Plaintiff is entitled to reinstatement of her LTD benefits until her condition significantly improves.

## IV. CONCLUSION

For the foregoing findings of fact and conclusions of law, Plaintiff is entitled to continue receive LTD benefits. Plaintiff shall submit a proposed judgment no later than a week from this ruling.

**IT IS SO ORDERED.**